# United States Court of Appeals
## For the First Circuit

Nos. 10-1275
     10-1593
     11-2290
     11-2346

MADELEINE CANDELARIO DEL MORAL,

Plaintiff, Appellee/Cross-Appellant,

v.

UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO,

Defendant, Appellant/Cross-Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, U.S. District Judge]

Before

Howard, Selya, and Thompson,
Circuit Judges.

Judith Berkan, with whom Mary Jo Méndez and Berkan/Méndez were on brief, for appellee/cross-appellant.
Christopher N. Manning, with whom Ashley W. Hardin and Williams & Connolly LLP were on brief, for appellant/cross-appellee.

November 9, 2012

**THOMPSON**, <u>Circuit Judge</u>.

**OVERVIEW**

This diversity suit for negligence presents interesting questions of Puerto Rico law in a complex procedural setting, but we will do our best to simplify. The combatants are plaintiff Madeleine Candelario del Moral ("Candelario") and defendant UBS Financial Services Incorporated of Puerto Rico ("UBSPR"). Candelario's ex-husband, David Efrón, also has a starring role in our story, though he is not a litigant in this case.

The lead issue argued here arises from a Puerto Rico judge's verbal order in the Candelario/Efrón divorce contest – basically the order vacated a multi-million dollar attachment Candelario obtained against Efrón's UBSPR accounts. A courtroom clerk later wrote that vacating order up in a document called "minutes," which never got signed by a judge and never got properly noticed to Candelario and Efrón. Claiming that the minutes were facially defective, Candelario insists that UBSPR was negligent as a matter of law in letting Efrón withdraw millions from certain accounts. UBSPR argues the opposite, not surprisingly. Ruling on cross-motions for summary judgment, Judge Casellas sided with Candelario, granting her motion as to liability. But acting on his own initiative, Judge Casellas granted her summary judgment on her damages claim too – even though she had expressly limited her motion to the threshold liability issue, candidly admitting that

genuine issues of material fact precluded any pre-trial resolution of the damages question. Both parties filed post-judgment motions, which Judge Casellas denied, and both now appeal, fighting tooth and nail over liability and damages, and also over whether we should reassign the case to a different district judge if a remand is needed. When all is said and done, we vacate the summary judgment for Candelario – because there is an unresolved material factual dispute, which a jury needs to sort out – and remand for trial. And, yes, we remand the case back to Judge Casellas for further proceedings, because we see no reason not to.

## BACKGROUND

Because the case comes to us on summary judgment for Candelario, we must take the facts and the reasonable inferences from them in the light most favorable to UBSPR. See, e.g., González-Droz v. González-Colón, 660 F.3d 1, 8-9 (1st Cir. 2011).

When Candelario filed this federal-court suit against UBSPR in 2008, her divorce from Efrón (after sixteen years of marriage) was seven years old. But the two were still fighting over money, and there was lots of money to fight over – millions and millions of dollars, in fact. To give the reader a rough sense of what happened here, we go back a few years.

### The Fallout from a Messy Divorce: Local-Court Proceedings

After shuttling between Puerto Rico trial and appellate courts in the early 2000s, Candelario got a judgment ordering Efrón to pay her $50,000 monthly till the marital estate was divvied up, with interest on any unpaid amounts set at 10.50%. Efrón thumbed his nose at the order – Candelario claimed for the longest time that she never received <u>any</u> payments – so Candelario marched to Superior Court in October 2006, accused him of stiffing her out of $4,160,552.61 (a figure that included interest), and moved the court to let her execute on his assets to satisfy the amount then owed. A Superior Court judge obliged, ordering the attachment or garnishment of Efrón's property so that "in due course" money could be "sent to this Court in an amount sufficient" to cover "the principal sum of $4,160,522.61," with "interest over said sum at a rate of 10.50% annually . . . ." The judge signed the "Order for Execution of Judgment," and the regional clerk signed the "Mandate of Execution of Judgment." (Excessive capitalization removed.)

Two days later, Efrón moved the judge to set aside the attachment, and the judge set a hearing for November. In the meantime, a court marshal served UBSPR with the attachment order and related documents, and UBSPR froze all of Efrón's accounts that same day. About a week later UBSPR moved the judge to clarify the exact amount Efrón owed and which (if any) of his securities it should sell. UBSPR suggested that the judge could take up its

motion at the hearing on Efrón's motion. But the judge chose not to do that and instead heard argument only on Efrón's motion.

Candelario and Efrón showed up for the November 2006 hearing with counsel. Because it was not a party to the litigation, UBSPR did not attend – apparently, family-law cases in Puerto Rico are not open to the public or to non-parties. Candelario and Efrón each testified about the amount of money that Efrón supposedly owed her. Ruling from the bench, the judge ended up vacating the attachment order for two reasons: first, because the amount attached appeared to exceed what Efrón actually owed (the judge put the number just south of $3.3 million), and, second, because another Superior Court judge was already handling issues related to the division of marital property. Candelario's counsel then orally moved for reconsideration. But the judge would have none of it: "Reconsideration denied," he said. "We affirm our finding. The orders of attachment are vacated . . . ." That ruling puts Superior-Court Rule 32(B)(1) front and center, a rule that pertinently provides that the "minutes" of the proceeding "will constitute the official record" of the key events "that occur at the hearing in court and in chambers" and "will be signed by the judge and notified to the parties" if they reflect a ruling or

order "issued by a judge in open court."[1]  Neither party got the minutes here until much later, as we are shortly to see.

The judge's oral ruling sparked yet another series of pitched battles in the Puerto Rico appellate courts.  Kicking things off, Candelario immediately filed a petition for mandamus asking the Puerto Rico Court of Appeals to reverse the judge.  Naturally, the Court of Appeals first checked to see if it had jurisdiction.  After quoting Rule 32(B)(1) and canvassing the caselaw, the court said that the contested ruling "does not appear in writing in a signed minute or notified order" and stressed that a party cannot repair to the Court of Appeals until the judge's "oral statement . . . is transcribed in ruling or minutes."  So the court dismissed her petition toward the end of November.

---

[1]  See Rule 32(B)(1) of the Rules for the Administration of the Court of First Instance of the Commonwealth of Puerto Rico, quoted in Sánchez Torres v. Hosp. Dr. Pila, 158 D.P.R. 255, 2002 WL 31789282 (2002) (official English translation, slip op. at 3).  At least one Puerto Rico appellate opinion – which the parties had translated and then placed in the joint appendix – quotes the rule as saying that the minutes "'shall be signed by the judge . . . .'" Candelario v. Efrón, No. KLRX200600058, slip. op. at 4 (P.R. Ct. App. Nov. 21, 2006) (quoting Rule 32(b)(1)) (certified copy provided by the parties).  Even UBSPR describes the judicial-signature part of the rule in "shall" terms.  The reason for this is that the rule uses the Spanish phrase "será firmada," and, apparently, there is no precise English equivalent – it translates as "will be signed" or "shall be signed." But whether it is "will" or "shall" does not matter.  Both are "unmistakably mandatory," Hewitt v. Helms, 459 U.S. 460, 471 (1983), and, importantly, the Puerto Rico appellate courts have treated the rule as mandatory in respects directly relevant to this case (more on that later).

-6-

Unhappy, Candelario petitioned the Puerto Rico Supreme Court a couple of weeks later for certiorari. Around this time, a courtroom clerk transcribed and signed the minutes and made them part of the Superior-Court file. The minutes accurately reported the judge's ruling – on this the parties agree: "The orders and annotations of attachment are hereby set aside." But the judge's signature appears nowhere on that document.

Things stayed quiet until February 9, 2007, when Candelario's lawyer wrote to UBSPR's outside counsel, saying that she was challenging the lower court's "verbal order" in the Supreme Court and that even though the attachment order "was verbally revoked" it "has never been notified" and thus "is not final and binding." (Emphases removed.) Consequently, Candelario's attorney demanded that UBSPR keep Efrón's accounts frozen. About a week later, on the 15th, the Supreme Court rejected her certiorari petition because she had submitted no Rule 32(B)(1) minutes showing what the judge's ruling was. That same day, Efrón's lawyer gave the minutes to UBSPR along with copies of Candelario's appellate filings and the appellate courts' orders denying her requests. UBSPR's assistant general counsel later said that that document delivery from Efrón's lawyer is what first clued UBSPR in to the verbal order. Whether that is right or whether UBSPR learned about the oral ruling from Candelario's lawyer on the 9th matters not. What matters is that UBSPR did not know about the verbal order

until sometime in February 2007 – long after the Superior Court judge spoke the words in November 2006. In any event, after its legal team perused the documents, UBSPR released the restraints on Efrón's accounts one day after he had passed along these papers – apparently, one account was worth more than $11 million at that time.

Candelario supposedly had no inkling of the minutes' existence until UBSPR's counsel wrote her lawyer back near the end of February 2007, saying that he had "read[] the minutes" of the hearing where the judge had verbally "set aside" the attachment order. He later faxed over a copy of the minutes, and Candelario then asked the Puerto Rico Supreme Court to reconsider the denial of her certiorari petition, attaching the missing minutes to her request. Her lawyer forwarded the motion to UBSPR's counsel and again insisted that UBSPR keep Efrón's accounts frozen, arguing that the judge's oral "revocation of the order of attachment" was not "final and enforceable" because the minutes had not been properly "notified." One can infer from the letter that she did not know that UBSPR had already unfrozen Efrón's accounts. Anyway, neither the motion nor the letter intimated even the slightest whisper of a hint that Candelario thought the minutes defective for lack of a judge's signature. Six days later, the Supreme Court denied Candelario's reconsideration request without saying why.

We fast-forward to May 2007, when Candelario petitioned the Superior Court to reinstate the vacated attachment order. A new Superior Court judge had taken over the case (the first judge had retired), and she issued a written order saying that she would take up that matter once she had had a chance to check out the file. But Candelario petitioned the Puerto Rico Court of Appeals to compel the judge to reinstate the attachment order straightaway, and this time the court granted her request. Heeding the appellate court's command, the judge in August 2007 ordered UBSPR "to immediately sell and liquidate" the securities in three specific Efrón accounts "up to the amount of $4,160,522.61" (a directive that took care of UBSPR's earlier clarification motion) and to issue Candelario a check promptly after doing so. UBSPR sprang into action the following month, liquidating Efrón's accounts, using part of the proceeds to pay off a line of credit that it had extended to him (he owed about $804,043), and sending Candelario the $351,783.19 balance that remained.

It was now Efrón's turn to appeal, apparently, for he asked the Puerto Rico Court of Appeals to "revoke" the judge's August 2007 order. The court refused, and in laying out the background facts, it emphasized these points: the first Superior Court judge had "verbally annulled the attachment orders"; an earlier panel had dismissed Candelario's bid to undo that order because the lower court "had yet to issue its judgment in writing";

-9-

the Supreme Court had denied her relief for essentially the same reason; and the minutes capturing the verbal order "were certified by the Courtroom Services Clerk," though "the judge who presided over the hearing" never signed them.

### The Fallout from the Fallout: Federal-Court Proceedings

Changing gears, Candelario headed to Puerto Rico's federal district court in August 2008, invoked diversity jurisdiction, see 28 U.S.C. § 1332(a)(1), and sued UBSPR for negligently releasing Efrón's funds and paying off his credit-line account, see P.R. Civ. C. art. 1802, P.R. Laws Ann. tit. 31, § 5141. She sought a judgment for $3,808,739 (representing the difference between the $4,160,522 attachment amount and the $351,783 she got from UBSPR, if we disregard pennies, which we will do from here on out) plus interest. After a period of pre-trial discovery, the parties filed dueling motions for summary judgment. Candelario asked for summary disposition on liability only, and she conceded that the damage-calculation issue had to be resolved at trial.

Finding no local caselaw exactly on point concerning "the validity of the verbal order," Judge Casellas certified the following questions of law to the Puerto Rico Supreme Court:

> 1. Is a verbal order, issued in open court in a civil case, valid and executable from its inception?

-10-

2. Does a verbal order require notification of the written Minutes, or transcript of the proceedings, and the presiding Judge's signature, for its validity, pursuant to Rule 32?

3. Is a verbal order, issued in open court in a civil case, and transcribed in the court's Minutes, valid if the Minutes were never notified to the parties nor signed by the presiding Judge?

The Supreme Court denied the petition, however, so Judge Casellas had to make an Erie prediction – a phrase used as a shorthand way of describing what federal judges since Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938), often do when local law may be uncertain – i.e., follow the rule they think the highest local court would follow. See Whyte v. Conn. Mut. Life Ins. Co., 818 F.2d 1005, 1011 n.22 (1st Cir. 1987). And that is what he did.

At the outset of his decision, Judge Casellas gave a primer on Puerto Rico negligence law and framed the lead issue this way: Is "a verbal order," given "in open court at the Commonwealth level, . . . valid and enforceable from its issuance, if it was not notified to the parties in Minutes signed by the presiding Judge"? Saying again that no Puerto Rico opinion explicitly answered that question, Judge Casellas mined what nuggets he could from the available caselaw. On doing so, he saw that Puerto Rico courts insist on strict compliance with Rule 32's requirements – at least when it comes to triggering the appeal process, which is precisely why the appellate courts rejected Candelario's appeals/petitions.

-11-

With this in mind, and keeping his eye on the literal words of Rule 32, Judge Casellas concluded that a verbal order "is not final, and thus enforceable, until the Courtroom Clerk issues the Minutes for the proceedings, the Judge signs the same," and the parties are properly notified.  And because Rule 32's requirements were not satisfied here, Judge Casellas ruled that UBSPR acted negligently when it unfroze Efrón's accounts based on minutes neither signed by a judge nor formally notified to the parties.

But that was not all.  Judge Casellas then sua sponte granted Candelario summary judgment on the damages issue.  UBSPR had correctly paid off Efrón's credit-line account, the judge ruled.[2]  But despite the Superior Court's giving her a $4,160,522 attachment order, Candelario only got $351,783 from Efrón's UBSPR accounts, leaving a $3,808,739 shortfall.  So Judge Casellas ordered UBSPR to pay that amount, plus 10.50% interest from the date (way back in 2001) when Efrón was required to start making the $50,000 monthly payments to Candelario.

The parties later filed post-judgment motions, and Judge Casellas issued written rescripts denying them.  The nitty-gritty details of these motions and rulings are unimportant, so we will skip them.

---

[2] The judge held that the UBSPR/Efrón credit-line agreement gave UBSPR "a perfected first-priority lien and security interest over the assets" in Efrón's accounts.  We offer no opinion on the correctness of his conclusion.

Both UBSPR and Candelario eventually filed appeals. Which brings us to today.

## ANALYSIS

The parties bombard us with arguments in an effort to convince us that Judge Casellas got more than one ruling wrong. But only two broad categories of arguments require our attention.

### (1)
### Summary Judgment

Our standard of review in this setting is familiar. We give a fresh look to Judge Casellas's summary-judgment decision, affirming only if, viewing the admissible evidence in the light most agreeable to UBSPR, we spot no genuine dispute of material fact for a jury to decide and conclude that Candelario is entitled to judgment as a matter of law. See, e.g., Soto-Padró v. Pub. Bldgs. Auth., 675 F.3d 1, 5 (1st Cir. 2012). That this is a negligence case brings another important principle front and center, complicating things for Candelario. We explain briefly.

Puerto Rico law defines negligence as the failure to exercise due diligence to prevent foreseeable harm. See, e.g., Malave-Felix v. Volvo Car Corp., 946 F.2d 967, 971 (1st Cir. 1991) (collecting Puerto Rico cases). To prevail on a negligence claim, a plaintiff must show duty, breach, causation, and damages, see, e.g., Woods-Leber v. Hyatt Hotels of P.R., Inc., 124 F.3d 47, 50 (1st Cir. 1997) (marshaling Puerto Rico cases), concepts that all first-year law students learn. As argued by the parties, this case

-13-

turns on the first two essentials – duty and breach. Of course whether a duty exists is typically a legal question for the court. See, e.g., Wojciechowicz v. United States, 582 F.3d 57, 66 (1st Cir. 2009); Restatement (Second) of Torts § 328B (noting that the court decides both "whether [the] facts give rise to any legal duty on the part of the defendant" and "the standard of conduct required of the defendant by his legal duty"). But breach of duty – involving fluid concepts like reasonableness and foreseeability, see Vázquez-Filippetti v. Banco Popular de P.R., 504 F.3d 43, 49 (1st Cir. 2007) (discussing Puerto Rico law) – is usually an issue for a factfinder, meaning summary judgment is generally an improper vehicle for resolving questions of this sort, see, e.g., Jewelers Mut. Ins. Co. v. N. Barquet, Inc., 410 F.3d 2, 15 (1st Cir. 2005); Mejías-Quiros v. Maxxam Prop. Corp., 108 F.3d 425, 427 (1st Cir. 1997); Taylor v. Gallagher, 737 F.2d 134, 137 (1st Cir. 1984). An exception exists where a reasonable jury could only decide the breach-of-duty issue one way, in which case a judge can resolve the matter on summary judgment. See, e.g., Jewelers Mut. Ins. Co., 410 F.3d at 15; Taylor, 737 F.2d at 137. But such negligence cases are rare birds indeed. See 10A Charles A. Wright et al., Federal Practice and Procedure § 2729, at 533 (3d ed. 1998).

    With these principles in mind, we press on.

**<u>Liability</u>**

First up is the duty-of-care issue. UBSPR does not disagree that it owed Candelario <u>some</u> duty in this situation – <u>i.e.</u>, where (among other things) it was not a party in the Candelario/Efrón divorce proceedings, was not in Superior Court when the judge orally vacated the previous attachment order, and, according to its assistant general counsel, only learned of the verbal ruling when its client forwarded (along with other papers) minutes lacking a judge's signature. And highlighting many non-Puerto Rico decisions – most prominently <u>Hicks</u> v. <u>Midwest Transit, Inc.</u>, 531 F.3d 467 (7th Cir. 2008), and <u>United States</u> v. <u>Morton</u>, 467 U.S. 822 (1984) – UBSPR agrees with Candelario on what the duty in play here is: When a bank-like institution (which we will simply call a bank from here on out) is handed what is supposedly an order releasing an attachment, it must see whether the order is facially valid – but, in this context, that is it; the bank has no duty to look beyond the four corners of that document in sizing up its legitimacy. <u>See</u>, <u>e.g.</u>, <u>Hicks</u>, 531 F.3d at 471-72 (discussing, among others, <u>Morton</u>). This kind of facial-validity review must have some substantive content; otherwise it would be an empty exercise, which is something the law detests. <u>See</u>, <u>e.g.</u>, <u>Ward</u> v. <u>Comm'r of Soc. Sec.</u>, 211 F.3d 652, 656 (1st Cir. 2000). <u>Hicks</u> and <u>Morton</u> respectively held that the facial-validity standard applies when one is deciding whether to comply with attachment or

-15-

garnishment orders. But we see no reason why that standard should not hold sway when a bank is deciding whether to accept an order purporting to vacate an attachment.

This facial-validity approach – which Judge Casellas followed – squares with commonsense realities, providing a not-too-burdensome way for busy banks to live up to some basic responsibilities: protecting accounts against questionable attachment-related maneuvers, on the one hand, and complying with valid court orders, on the other. And given the unique confluence of circumstances – with everyone (including the judge) agreeing on a duty formula driven not only by persuasive precedent (with no contrary caselaw cited to us) but also by common sense – we assume the Puerto Rico Supreme Court would say: A bank like UBSPR has a duty in a case like this to see whether minutes releasing an attachment are facially valid under Puerto Rico law – with UBSPR and its ilk presumed to know what a facially-valid order looks like – but has no duty to go outside the face of that document. It goes without saying (though we say it anyway) that Puerto Rico is free to tell us that we are all wet on this, and thus wipe away what we have written.

Next we turn to the breach issue, which is the decisive issue here. But before we do that, we must get something straight. UBSPR writes that Judge Casellas focused on whether the oral order vacating the attachment was effective when spoken, casually adding

in a footnote to its opening brief that some non-Puerto Rico cases hold that verbal orders are effective immediately.[3] UBSPR does not seriously press the point there, however, which makes waiver a real possibility.  See, e.g., United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (discussing how an argument is waived by "perfunctory" treatment).  No matter.  UBSPR really pins its reversal hopes on the minutes that memorialized the verbal order, stressing that these are what it had "received and reviewed" before releasing Efrón's accounts.  Unsurprisingly, then, we zero in on UBSPR's minutes-based arguments.

Convinced that it acted reasonably under the circumstances, UBSPR's position on the breach issue can be succinctly summarized:  Certified by a clerk and placed in the court file, the minutes, UBSPR says, used clear and unequivocal language ("[t]he orders and annotations of attachment are hereby set aside") and are self-evidently valid to the lay mind, which UBSPR insists is all that is required for facial validity.  See Morton, 467 U.S. at 829 n.10 (agreeing that "[f]acial validity of

---

[3] These cases do not control our case.  One says nothing – repeat, nothing – about verbal orders.  See Smith v. Cain, 132 S. Ct. 627 (2012).  Others are factually distinguishable, since they involve (as best we can tell) parties who were present when the judge made his or her oral ruling, not a non-party like UBSPR who was not.  See Roland v. Phillips, 19 F.3d 552 (11th Cir. 1994); Knott v. Knott, 395 So.2d 1196 (Fla. Dist. Ct. App. 1981).  And the rest offer little in persuasive analysis and thus are not helpful on this point.  See Dynamic Changes Hypnosis Ctr. v. PCH Holding, LLC, 306 B.R. 800 (E.D. Va. 2004); In re Bill Heard Chevrolet, Ltd., 209 S.W.2d 311 (Tex. App. 2006).

a writ need not be determined upon the basis of scrutiny by a trained legal mind") (internal quotation marks omitted); accord Hicks, 531 F.3d at 472.  And so, building to the ultimate crescendo, UBSPR says that, having relied on facially valid minutes, it unquestionably behaved reasonably in unfreezing Efrón's accounts and thus cannot be negligent as a matter of law.

A key premise of UBSPR's argument – that the minutes are facially valid – is wrong, we believe, though we do not pretend that this is an easy matter since it involves predicting how the Puerto Rico Supreme Court would handle this subject.  Thankfully, there is enough here to do that, at least that is how we see it.

We start with Rule 32(B)(1), which, again, requires that the minutes – representing the "official record" of in-court and in-chambers events – "be signed by the judge and notified to the parties" if they commemorate "a ruling or order . . . rendered in open court . . . ."[4]  George Orwell famously said that "[t]o see

---

[4] The relevant text states:

The minutes will constitute the official record of the most important incidents that occur at the hearing in court and in chambers, and will be prepared as prescribed by the rules established by the Administrative Director of the Courts and certified by the Clerk of Court Services.

The original minutes will be included in the court record. . . .

. . . .

The minutes will not be notified to the parties or

-18-

what is in front of one's nose needs a constant struggle."[5]  But it does not take much to see that no judge signed the minutes here.[6] Sure, we know of no Puerto Rico Supreme Court case holding minutes invalid for lack of a judge's signature.  And yet while the Erie lights may seem dim, they do illuminate the likely path that that court would take.  Consider Cruz González v. Thermo King de P.R., Inc., a Puerto Rico Court of Appeals case stating that "[o]nly" with a judge's signature will the minutes "constitute a judicial holding."  Civ. No. CPE2001-0270 (401), 2006 WL 4073763 (TCA Dec. 20, 2006) (certified translation provided by the parties at our request, slip. op. at 2) (emphasis added).  The reasoning behind that conclusion is straightforward:  Without a judge's signature,

---

        to counsel, unless they include a Resolution or an Order
        issued by the judge in open court, in which case, [they]
        will be signed by the judge and notified to the parties.

(Emphasis removed.)  For the cite, see supra note 1.

[5] George Orwell, In Front of Your Nose, in 4 The Collected Essays, Journalism and Letters of George Orwell:  In Front of Your Nose, 1945-1950 125 (Sonia Orwell & Ian Angus eds., 1968).

[6] True, Judge Casellas did find UBSPR negligent for relying on minutes neither signed by a judge nor formally notified to the parties.  We focus solely on the signature issue, however, because (unlike with notice) whether there is a signature is readily apparent from the face of the minutes, and so is most relevant in deciding if UBSPR satisfied its duty of seeing that that document was facially valid.  In a footnote to her opening brief, Candelario seemingly suggests that the minutes are also defective because the wrong clerk "certified" them.  But the claim is inadequately developed there and so is not properly preserved for review.  See, e.g., Solis-Alarcón v. United States, 662 F.3d 577, 584 (1st Cir. 2011); Zannino, 895 F.2d at 17.

"the minute[s] only reflect[] the impression of the . . . courtroom employee who prepared it, which will not necessarily coincide" with what the judge actually ruled "in open court." See id. And that signature formality must be respected, otherwise chaos could result, Cruz González surely implies. See id.[7] So in other words, the judge's-signature requirement is not a picayune thing to be brushed aside whenever it pleases, at least according to Cruz González. And to suggest, as UBSPR does, that that requirement means nothing in gauging the minutes' validity strikes us as incorrect – since in such a world a bank could end up following a non-judicial holding, reflecting the court clerk's thoughts, not the judge's, which is a no-no. Given all this, we, like Judge Casellas, are reasonably confident that the Puerto Rico Supreme Court would consider a judge's signature indispensable to the minutes' facial validity in cases of this sort.

---

[7] Generally speaking, Puerto Rico law is what the Puerto Rico Supreme Court says it is. See, e.g., West v. Am. Tel. & Tel. Co., 311 U.S. 223, 236 (1940). But we can and do look to Cruz González because there is no reason to think that the high court would hold differently. See Fid. Union Trust Co. v. Field, 311 U.S. 169, 177-78 (1940) (stressing that "[a]n intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question"); see also West, 311 U.S. at 236 (similar). And we accept Cruz González for its sheer persuasiveness, as we are entitled to do. See P.R. Laws Ann. tit. 4, § 24x.

Ever persistent, UBSPR suggests that <u>Hicks</u> and <u>Morton</u> help highlight the facial validity of the minutes. We think the opposite is true.

The <u>Hicks</u> plaintiff sued a financial services company for negligence after the company froze one of his accounts. <u>See</u> 531 F.3d at 468. The company pointed out that it had acted under a judicial attachment order. <u>See</u> <u>id.</u> at 468-70. But the plaintiff insisted that the order was defective, arguing that the court-appointed receiver who had asked for the attachment should have but failed to post a surety bond. <u>Id.</u> at 471. He raised some service-of-process and personal-jurisdiction issues too. <u>Id.</u> at 472-73. Applying a facial-validity test, the <u>Hicks</u> court bought none of it. The attachment order, the court stressed, had the classic "trappings of valid legal process," bearing the case number and caption, the judge's signature, and the court clerk's attestation. <u>Id.</u> at 473. Some defects are obvious from a quick look at an order, the <u>Hicks</u> court noted. <u>Id.</u> at 472. But these ones – dealing with the posting of a surety bond, service of process, and personal jurisdiction – were <u>not</u>. <u>Id.</u> at 472-73. And the <u>Hicks</u> court held that an attachment-order recipient has no duty to go beyond the "indicia of legitimacy" and scour the law books for potential legal problems in deciding whether to comply. <u>Id.</u>

So too the <u>Morton</u> Court. There, an Alabama tribunal had issued a writ – on a form regularly used by that court – subjecting

the pay of an Air Force officer in Alaska to garnishment for unpaid child support and alimony. 467 U.S. at 824. The government honored the writ, over the officer's objections. Id. Not willing (apparently) to take this lying down, the officer sued the government in federal court to recover the amounts withheld from his check, arguing that the Alabama court had no jurisdiction over him when it issued the writ. Id. at 824-25. A federal statute lets the government off the liability hook in situations like this if it had acted "'pursuant to legal process regular on its face . . . .'" Id. at 825 (quoting 42 U.S.C. § 659(f)). The Morton court concluded that the writ fell within that category, adding that a garnishee is not required to go beyond the writ's face and explore arcane corners of the law like personal jurisdiction in figuring out whether to obey. Id. at 828-32.

Compare those cases with ours and the differences are night and day. The Hicks and Morton orders were "regular" on their "face," full of telltale validity signs – a judge's signature in Hicks, for example; the court's use of a standard writ-of-garnishment form in Morton. And one could not spot the complained-of defects simply by eyeballing the documents. Cf. Millard v. United States, 16 Cl. Ct. 485, 489 & n.3 (1989) (holding that the supposed facial defects with an order – that it (a) failed to comply with California laws concerning personal service and default judgments and (b) was not a final order – "are precisely the sort

-22-

of defects" that "a facially-directed inquiry was meant to exclude," adding that the order was "complete in all its details," having (among other things) "the stamped signature of the judge [who] ordered the action"). Contrastingly, the minutes here were not "regular" on their face, lacking an essential validity indicator under Rule 32(B)(1) – a judge's signature. And this defect jumps off the page. Consequently, Hicks and Morton hurt rather than help UBSPR's facial-validity theory.

Still hoping to persuade us differently, UBSPR basically argues that the Puerto Rico Supreme Court would not insist on strict compliance with Rule 32(B)(1)'s terms, adding that our opinion in Goya Foods, Inc. v. Wallack Mgmt. Co., 290 F.3d 63 (1st Cir. 2002) ("Goya," for short), should light the way. We think not.

Goya refused to require slavish compliance with the requirements of Puerto Rico Rule of Civil Procedure 56, id. at 72, a rule that lets courts issue provisional remedies like ex parte attachments: "'The attachment and prohibition to alienate real property,'" the rule reads, "'shall be effected by recording them with the Registry of Property and notifying the defendant,'" id. at 70 (quoting Rule 56.4). Among other problems, the attachment there was never recorded. Id. at 71. Yet we held it effective. Id. at 74. And while UBSPR's reliance on Goya has a certain superficial appeal, that case differs from ours in a critical respect (there

-23-

are others, but this is enough for now):  The Puerto Rico Supreme Court construes Rule 56 expansively, we noted, adding that that court believes flexibility is that rule's "'"greatest virtue"'" – a "'"virtue"'" judges "'"should promote and preserve"'" rather than bedevil "'"with technical concepts and requirements."'"  Id. at 71 (quoting HMG Prop. Investors, Inc. v. Parque Indus. Rio Canas, Inc., 847 F.2d 908, 914 (1st Cir. 1988), which in turn was quoting F.D. Rich Co. v. Super. Ct., 99 P.R.R. 155, 173 (1970)).  But UBSPR cites no Puerto Rico cases (nor are we aware of any) requiring courts to construe Rule 32(B)(1) flexibly, like courts must do when working with Rule 56.  Actually, the cases that the parties talk about require strict adherence to Rule 32's terms, see, e.g., Sánchez Torres v. Hosp. Dr. Pila, 158 P.R. Dec. 255, 2002 WL 31789282 (2002) (certified translation provided by the parties) – indeed, we need not look beyond what the Puerto Rico appellate courts did here to know this:  Remember, these courts spurned Candelario's appeals/petitions because Rule 32(B)(1) was not followed to a T.  Admittedly, these cases deal with an order's appealability, not enforceability, as UBSPR is quick to point out (e.g., the cases stress how the minutes must be signed by the judge and notified to parties to fire up the appellate process).  But they help show which way the Erie wind blows in Puerto Rico, a breeze (if only a slight one) indicating that the loose tack taken with Rule 56 has no business in this case.

The short of it is that, despite UBSPR's contrary view, we believe that the fought-over minutes are facially defective under Puerto Rico law for lack of a judge's signature (though, again, the highest or first-writing court of Puerto Rico is obviously free to reject our Rule 32(B)(1)-based analysis). Yet we cannot end our breach discussion here. As a negligence case, reasonable care applies, see, e.g., Vázquez-Filippetti, 504 F.3d at 49, meaning the question now is: Was UBSPR's mistake in deeming the minutes facially valid reasonable under the circumstances? Reasonableness in this context is generally a question for the jury, as we mentioned a few pages ago. See, e.g., Jewelers Mut. Ins. Co., 410 F.3d at 15; Taylor, 737 F.2d at 137. So a judge cannot decide that issue on summary judgment unless the reasonableness or unreasonableness of what a party did or did not do is beyond dispute. See, e.g., Jewelers Mut. Ins. Co., 410 F.3d at 15; Taylor, 737 F.2d at 137. Cases like that are doubtless few and far between, which is why summary judgments for negligence plaintiffs are not everyday occurrences. See, e.g., 10A Federal Practice and Procedure, supra, § 2729, at 573-75.

What we need to figure out, then, is whether – if the summary-judgment record were a trial record – a rational jury could only conclude that UBSPR acted unreasonably in releasing the attachment. If the answer is yes, the summary judgment for Candelario on this issue can stand. If the answer is no, a

reversal is necessary.  See, e.g., Taylor, 737 F.2d at 137. Viewing the facts and inferences (as we must) most favorably to UBSPR, we believe the answer is indeed no.

Getting a grip on what makes minutes facially valid in Puerto Rico required some work on our part.  Again, no Puerto Rico case has stamped minutes facially invalid for want of a judge's signature.  We got there through a judicial mind-reading exercise of sorts, picking up on clues pointing out an Erie direction.  Ours is an educated prediction (we are not in the same predicament as the philosopher who compared his calling to searching in a dark room for a black cat that is not there), but it is a prediction still the same.

Now consider how UBSPR handled the situation.  Based on a bank official's unsworn declaration, see 28 U.S.C. § 1746 (permitting a document like this to substitute for a sworn affidavit), we know that UBSPR had its lawyers look the minutes over before unfreezing Efrón's accounts.  But what steps they took in this process the record does not say.  Yet approaching the summary-judgment materials from a UBSPR-friendly vantage, one can reasonably infer that they made that call (at least in part) because of the absence of any Puerto Rico case holding unsigned minutes facially defective – a case shortage that caused Judge Casellas to ask the Puerto Rico Supreme Court for help, by the way. Also and importantly, once Candelario read the minutes (which was right around the time UBSPR released the attachment), she said

-26-

nothing either in her communiqués with UBSPR or in her motion to reconsider with the Puerto Rico Supreme Court that suggests that she thought that the nowhere-to-be-found signature was a problem – a fair inference could be that she, like UBSPR, believed that the missing signature did not affect the minutes' validity. On top of all that, UBSPR's compliance manual provides (emphasis ours) that "[o]nce placed on an account," an attachment "can only be released upon receipt of a court order or other instruction from the court," and the underscored phrase plausibly suggests that something short of signed minutes may suffice. Critically, Candelario concedes that the UBSPR manual is "consistent" with Puerto Rico law.

Obviously she draws a different inference from that passage. And she also argues that there is plenty here from which a rational jury could infer unreasonableness on UBSPR's part: (a) UBSPR's lawyers "should have advised" UBSPR "that Rule 32 requires the judge's signature," she writes – but did not. (b) UBSPR could have asked the Superior Court judge to clarify any "doubts it had" concerning "the impact of the minutes" (something it had no trouble doing, she adds, as its earlier motion to clarify the first attachment order shows) – but did not. And (c) UBSPR could have taken other legal steps to protect itself (filing an interpleader action, perhaps, she suggests) – but, once again, did not. At this stage, however, we are duty-bound to draw all reasonable inferences helpful to UBSPR, not Candelario. And because the facts here "admit[] of more than one inference"

concerning the "reasonableness" of UBSPR's conduct, the reasonableness issue must go to the jury. Taylor, 737 F.2d at 137.

Let us be crystal clear. At this point, we simply hold that, on the record as it currently exists, a level-headed jury could find that UBSPR acted reasonably, which makes a trial necessary. Of course whether UBSPR did act reasonably remains to be determined. And the trial may cast the facts in a completely different light. Also, now that we have made our Erie prophecy that the Puerto Rico Supreme Court would consider minutes unsigned by a judge invalid, Candelario may want to ask Judge Casellas to reopen discovery, though we express no view on how a motion like that might fare.

### Damages

The parties spill much ink debating a host of damages-related issues (the amount, the right interest rate, etc.). But because we reverse on liability, we need not grapple with any of their arguments. Instead, we simply vacate the damages-related rulings and award (including those having to do with interest) and stress that these issues can be hashed out as necessary on remand.

### (2)
### Judge on Remand

Which district judge should handle the case from here on out is something that is sharply contested by the parties. See generally D.P.R.R. 3A(e)(3) (indicating a general presumption in favor of remanding to the same judge). Citing 28 U.S.C. § 455(a)

-28-

and § 2106, UBSPR – over Candelario's spirited opposition – says that a new judge should run any remand. Section 455(a) requires a judge to recuse himself whenever "his impartiality might reasonably be questioned." And section 2106 lets us craft remands in the interest of justice, a proviso that empowers us to direct that a different judge take over when we send a case back. See Hull v. Mun. of San Juan, 356 F.3d 98, 104 (1st Cir. 2004). Importantly, UBSPR does not invoke section 455(b), which offers a list of situations requiring recusal, one of which is where a judge "has a personal bias or prejudice concerning a party . . . ." See 28 U.S.C. § 455(b)(1). Also importantly, the parties agree that reassignment to another judge on remand is for the rare and exceptional case. See Conley v. United States, 323 F.3d 7, 15 (1st Cir. 2003) (en banc). This is not that case, and here is why:

Training its sights exclusively on the post-judgment rulings, UBSPR accuses Judge Casellas of sympathizing too much with Candelario – for proof, it points to his writing about her "10-year long quest to access her rightful share of the marital estate," her "plight to collect" the judgment, and Efrón's effort to "turn the tables" on her. UBSPR also blasts Judge Casellas for saying both that it had acted "hast[ily]" in "accomodat[ing] the whims" of Efrón, one of its "wealthy client[s]," and that it had poorly briefed the legal issues in its post-judgment papers. But judging is all about making judgments, obviously. See Nelson v. Scala, 192 F.3d 32, 35 (1st Cir. 1999). And human nature being what it is,

-29-

those tasked with making some of the hardest calls imaginable may, quite understandably, develop strong feelings about the cases they work on. See, e.g., Liteky v. United States, 510 U.S. 540, 556 (1994). So while they must avoid even the appearance of partiality, even when bias or prejudice does not exist, see, e.g., id. at 548, we do not expect trial judges to act like unemotional cyborgs of sci-fi fame, see Logue v. Dore, 103 F.3d 1040, 1046 (1st Cir. 1997); see also Obert v. Republic W. Ins. Co., 398 F.3d 138, 145 (1st Cir. 2005). That is why problems with the views they form in slogging through cases typically do not provide "a sound basis either for required recusal or for directing that a different judge be assigned on remand." Hull, 356 F.3d at 104 (citing Liteky, 510 U.S. at 555-56, which held, among other things, that judicial comments "critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge"). This case exemplifies the general rule, not the exception to it: Taking everything into account, we see nothing suggesting that Judge Casellas cannot reapproach the case with an open mind, which erases any aura of bias. See Maldonado Santiago v. Velázquez García, 821 F.2d 822, 832 (1st Cir. 1987). The upshot, then, is that UBSPR cannot get the remedy it seeks.

## CONCLUSION

Our work finally over, we **vacate** the summary judgment for Candelario and **remand** for further proceedings consistent with this

opinion, though we do not think that we are crossing any lines in "suggesting that this is a case best resolved by settlement." <u>See</u> <u>Bos. Edison Co.</u> v. <u>Fed. Energy Regulatory Comm'n</u>, 233 F.3d 60, 69 (1st Cir. 2000). Again, we intimate no view on the ultimate outcome.

**<u>Vacated and Remanded</u>**. **<u>Costs to UBSPR</u>**.