## In the Matter of Stephen R. Wainwright
### (and a consolidated case[1]).

Suffolk. December 5, 2006. - February 20, 2007.

Present: Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Attorney at Law,* Representation of differing interests, Conflict of interest, Public reprimand.

The evidence before a hearing committee of the board of bar overseers was sufficient to establish the respondents' violations of the disciplinary rules in representing two clients whose interests obviously were differing, if not in conflict [384-386]; because the respondents' violations were errors of omission rather than commission (in that they failed to fulfil an affirmative obligation to disclose, and were neglectful in delaying telling one client to seek counsel who would have his interests exclusively in mind), this court concluded that public reprimands, rather than the more serious punishment of suspensions, were the appropriate sanction [386-388].

Informations filed in the Supreme Judicial Court for the county of Suffolk on April 26, 2006.

The cases were reported by *Greaney,* J.

*Jane R. Rabe,* Assistant Bar Counsel.

*David Berman* for Stephen R. Wainwright.

*Richard L. Wainwright,* pro se.

Cordy, J. The respondent attorneys, Stephen R. Wainwright and Richard L. Wainwright, are brothers who practiced law in the Brockton firm of Wainwright Wainwright Wainwright Wainwright and Wainwright. They were found by the Board of Bar Overseers (board) to have represented two parties with opposing interests in connection with a real estate transaction, thus breaching various ethical obligations. Informations were filed in the county court recommending that each be suspended from the practice of law for three months, with reinstatement conditioned on their passing the multistate professional responsi-

---

[1] In the Matter of Richard L. Wainwright.

bility examination. A single justice reserved and reported the cases to the full court. We concur with the board that the respondents violated the disciplinary rules, and direct that public reprimands be imposed.

1. *Facts.* The facts found by the hearing committee were adopted by the appeal panel and by the board. They are supported by substantial evidence in the record, and accordingly, we adopt them as well. See S.J.C. Rule 4:01, § 8 (4), as appearing in 425 Mass. 1309 (1997). They are summarized below.

Richard Wainwright has been a member of the bar since 1963; Stephen Wainwright, since 1967.[2] The conduct relevant here occurred between 1990 and 1993. Beginning in the early 1980's, Stephen handled a significant amount of legal work for Edward Baggia, a real estate developer. Baggia and Stephen also had a business relationship, including a loan of approximately $450,000 made to Baggia from a trust created by Stephen for his wife and mother-in-law. Stephen also worked on various real estate transactions with Baggia's wife and daughter, in some of which he had a personal financial interest.

One entity created in the course of Stephen's work for Baggia was the Circle Realty Trust (Circle). Baggia had no beneficial or ownership interest in Circle, although his wife and the wives of two of Baggia's business associates did. As trustee of Circle, Baggia developed a condominium project called Flaggstone Place (Flaggstone) in Bridgewater on land owned by Circle. Stephen did the legal work on this project. By 1990, Baggia had built and sold two-unit condominiums on fifteen of the sixteen lots at Flaggstone.

Elphege Boyer was in the excavation and construction business, and had worked for Baggia on various projects, including Flaggstone. By the summer of 1990, Baggia owed Boyer at least $45,000. At the same time, Baggia's financial situation had deteriorated, as had the general state of the real estate market. His projects suffered foreclosures, and he had a number of creditors demanding payment. Many of the banks that had supported his projects had failed, and others would not release

---

[2]To avoid confusion we shall refer to each brother by his first name throughout this opinion.

more funds to continue work because the Federal Deposit Insurance Corporation (FDIC) would not allow it.

In order to pay his debt to Boyer, Baggia wanted to convey to him the last Flaggstone lot (lot 16) for $80,000, less the $45,000 owed. The two met with Stephen sometime in the summer of 1990 to discuss the transaction. Stephen advised them that the sale was not possible because Circle, not Baggia, owned lot 16, and Baggia had no legal right to transfer title in satisfaction of a personal debt. Stephen asked for time to consider how a deal might be structured, and subsequently consulted with Richard. Richard devised a new structure for the transaction. Stephen communicated Richard's plan to Boyer and Baggia, and they agreed to proceed.

Stephen drafted the new agreement, which included the following terms. Baggia, as trustee of Circle, would obtain a $250,000 construction loan from the Massachusetts Bank & Trust Company (Mass. Bank), which would be personally guaranteed by Boyer. An initial disbursement of $80,000 from the loan was to be paid out as follows: $45,000 to Boyer on Baggia's debt, $25,000 to Baggia for unstated purposes, and $10,000 for attorney and origination fees. Boyer was to use the balance of the loan to construct and then sell a two-unit condominium on lot 16. He was to pay off the $250,000 construction loan with the proceeds of the sale, with any profit divided equally between Boyer and Baggia.

Stephen drafted the loan documents and also represented Mass. Bank at the closing. The agreement, loan, and personal guarantee closed in October, 1990. Only Stephen, Boyer, and Baggia were present. At the closing, the initial $80,000 was distributed as agreed. Of the $10,000 for fees, $2,500 was paid to Mass. Bank for origination costs, $1,500 to Stephen as attorney for Mass. Bank, $2,500 to Stephen as attorney for Baggia, and $3,500 to Richard as "attorney for the contractor," i.e., Boyer. Boyer and Baggia also modified their agreement, with Boyer now to retain all net profits from the sale of the condominium units. Richard was not present at the closing, nor was he involved further in the transaction.

Only at the closing did Boyer become aware that Richard was being paid as his attorney. Richard never discussed the

transaction with Boyer or advised him on executing a personal guarantee on the $250,000 loan. Stephen also never advised Boyer individually about the risks of the transaction, nor did he refer him to Richard (or any other attorney) for such a discussion. Neither Boyer nor Baggia was asked to consent to being represented by the same firm in the transaction.

After the loan closed, Boyer began work on lot 16. Mass. Bank advanced another $80,000 of the $250,000 loan to pay for this work, making the total of disbursements $160,000. In 1992, Mass. Bank was closed by the FDIC and no further funds were advanced. To complete construction, Boyer was forced to use $45,000 of his personal funds. Baggia sold the first unit on July 22, 1993, at a price of $103,500. Stephen did the legal work on this sale. The closing on the sale was delayed because a lien for State taxes owed by Baggia had been recorded against the property. Stephen obtained a partial release from the Department of Revenue to permit the sale to go forward. Of the $103,500 closing price, $90,000 was paid toward the $160,000 advanced on the loan, with none of the proceeds going to Boyer.[3]

As a result of these complications, Boyer became concerned that other creditors of Baggia might obtain liens against the second unit. Boyer asked Stephen to take action to protect his interests by having the unit deeded to Boyer so as to prevent any future attachments. At this time, Boyer believed Stephen to be his attorney. Stephen did not take any action, nor did he refer Boyer to another attorney or suggest any other options (such as Boyer's suing Circle and Baggia and attaching the property).[4]

Stephen soon found a buyer for the second unit. However, before the sale could close, a title examiner discovered a levy on a $12,000 default judgment against Baggia recorded against the unit. The judgment was in favor of Gourdin Ready Mixed Concrete (Gourdin). Boyer, still thinking Stephen his attorney, went to see him about the lien. Stephen then told Boyer that he

---

[3]Presumably the rest went to the Department of Revenue in satisfaction of Baggia's tax debt, although the record is silent on this point.

[4]In June, 1993, Stephen did refer Boyer to another attorney to represent him in an unrelated matter. It involved a dispute between Boyer and another of Stephen's clients.

was not his attorney and referred him to another attorney. This was the first time Boyer was advised by either Stephen or Richard to seek independent advice. Boyer also confronted Richard, claiming that he had failed to protect his interests.

Represented by new counsel, Boyer reached a settlement with Gourdin that allowed the closing on the second unit to proceed. Boyer agreed that $8,000 from the proceeds would be paid to Gourdin in return for a full discharge of the lien. The sale closed on December 13, 1993. Its proceeds were used first to pay the balance of the construction loan and the Gourdin lien. The closing attorney then issued a check payable to Boyer for the remaining balance, $13,806.32. He gave the check to Stephen, who held himself out as Boyer's attorney at the closing. Under the agreement, the check was Boyer's property without qualification.

Later that same day, Boyer went to Stephen's office to get his check. Stephen refused to give Boyer the check until he signed a release of his claims against Baggia and "his attorneys, agents, and employees." Boyer refused to sign, because Baggia owed him another $7,500 under a separate note unrelated to this transaction. Stephen prepared a new release excluding that note, which Boyer signed on December 16, 1993. Stephen then gave Boyer his check.

The net result of the transaction was that Mass. Bank was paid back entirely ($160,000), Boyer settled Baggia's debt to Gourdin for $8,000, and Baggia got $25,000 from the initial loan that he never paid back (either to Boyer or to Circle).[5] Although Boyer received an initial $45,000 from the construction loan, he had to advance the same amount to complete the project. Thus, in effect, Baggia's $45,000 debt to Boyer was not repaid because the deal proceeds were insufficient. Boyer received $13,806.32 in proceeds from the second sale. Set against Baggia's total debt to him relevant here (including the amount paid to Gourdin but excluding the unrelated note), Boyer remained out $39,193.68. In contrast, Baggia gained about $82,000 in value from the transaction: the $25,000 from the initial loan he never repaid, the $12,000 judgment in favor of

_____

[5]Baggia told the hearing committee that he used these funds to cover his family's living expenses.

Gourdin he avoided, and the $45,000 debt to Boyer that remained unpaid.

2. *Prior proceedings.* Three years after the closing on the second unit, on December 6, 1996, Boyer filed a complaint with bar counsel. Five years later, on December 12, 2001, bar counsel filed petitions for discipline with the board. A hearing committee was appointed. It held hearings in April and July, 2003, and filed its report on January 18, 2005.[6] The conduct charged occurred before the adoption of the Massachusetts Rules of Professional Conduct, S.J.C. Rule 3:07, as appearing in 426 Mass. 1303 (1998). The hearing committee and the board therefore applied the earlier disciplinary rules.

The hearing committee found that by simultaneously representing both the debtor and creditor at various times, with those parties' interests being obviously adverse, and without informed consent, Stephen had violated S.J.C. Rule 3:07, Canon 5, DR 5-105 (A), (B), & (C), as appearing in 382 Mass. 781 (1981) (lawyer should exercise independent professional judgment on behalf of client), and DR 5-105 (D), as appearing in 397 Mass. 1216 (1986) (conflicts of lawyer's partners and associates imputed to lawyer); Canon 6, DR 6-101 (A) (2), as appearing in 382 Mass. 783 (1981) (lawyer should represent client competently); and Canon 7, DR 7-101 (A) (1)-(3), as appearing in 382 Mass. 784 (1981) (lawyer should represent client zealously within bounds of law). The committee also found that Stephen's failure promptly to give Boyer his check violated Canon 9, DR 9-102 (B) (4), as appearing in 419 Mass. 1303 (1995) (lawyer should pay or deliver funds promptly).

The committee found that Richard's representation of Boyer in the matter of the construction loan at the same time that Stephen represented Baggia (while the two men's interests were obviously adverse) similarly violated Canon 5, Canon 6, and Canon 7. The committee recommended that each brother receive a public reprimand. The respondents appealed, seeking dismissal. Bar counsel appealed the sanction recommended for Stephen, and sought instead a six-month suspension. Bar counsel

---

[6]The delay in the handling of these matters is inexcusable and inconsistent with a process of discipline that must be perceived by the bar and the public as "fair, orderly and rational." *Matter of Grossman, ante* 151, 161 (2007).

did not appeal from the sanction recommended for Richard. On September 20, 2005, an appeal panel of the board filed a report with the board adopting the factual and legal conclusions of the hearing committee and sustaining the recommendations of public reprimand.[7]

On December 12, 2005, the full board unanimously adopted the committee's findings of fact and conclusions of law. On the same vote, the board recommended a three-month suspension for each, reinstatement conditioned on passing the multistate professional responsibility examination (MPRE). A hearing was held in the county court on May 3, 2006. The single justice reserved and reported the cases to the full court.

3. *Analysis.* In bar discipline cases that have been reserved and reported, we "review the board's findings and reach our own conclusion." *Matter of Fordham*, 423 Mass. 481, 487 (1996), cert. denied, 519 U.S. 1149 (1997), citing *Matter of Anderson*, 416 Mass. 521, 525 (1993). "[A]lthough not binding on this court, the findings and recommendations of the board are entitled to great weight." *Matter of Fordham*, *supra*, citing *Matter of Hiss*, 368 Mass. 447, 461 (1975). Given the evidence admitted before the hearing committee, we have no difficulty accepting the board's conclusions as to violations of the disciplinary rules by both Stephen and Richard.

Canon 5, DR 5-105 (A), requires an attorney to "decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected . . . or if it would be likely to involve him in representing differing interests." Baggia was Stephen's client. That representation was imputed to Richard by virtue of their joint practice. See DR 5-105 (D). Boyer was Baggia's creditor. The relevant transaction was designed to satisfy the debt. It could not have been more obvious that the interests of Boyer and Baggia were "differing," if not in conflict. Therefore, both Stephen and Richard should have declined to represent Boyer.

Under Canon 5, DR 5-105 (C), Stephen and Richard could

---

[7]The appeal panel also recommended that each brother be required to pass the multistate professional responsibility examination (MPRE) within one year, with a three-month suspension for Stephen should he fail, and a one-month suspension for Richard to be imposed if he should fail.

have obtained consent for this dual representation "after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."[8] Neither did so. Nor did either recommend to Boyer that he seek alternative representation in this matter until Stephen referred Boyer to another attorney between the two closings. By that time the Gourdin lien was already in place, and Boyer had few options remaining. In the interim, Boyer made requests of Stephen and Richard for action to protect his interests. Their failure to take such action, and their delay in referring Boyer to another attorney, constituted neglect, prejudiced Boyer's interests, and caused financial harm to Boyer. This behavior constituted violations of DR 6-101 (A) (2) and DR 7-107 (A) (1)-(3).

Stephen argues in defense that there was no conflict of interest in this transaction "because Baggia and Boyer shared a single objective, which was to [pay the debt by transferring the property]." Richard makes the same claim. The board aptly characterized this argument as "frivolous." Neither Stephen nor Richard cites any authority for the proposition that the relationship of debtor and creditor does not constitute a conflict for purposes of representation. Indeed, a creditor's legally enforceable rights against his debtor presents a classic conflict of legal interests. Even if the parties had an "overwhelming common interest," each considering the transaction mutually advantageous, the debtor-creditor relationship necessarily created "conflicting interests." *Matter of Dittami*, 12 Mass. Att'y Discipline Rep. 98, 107 (1996). Cf. *McCann* v. *Davis, Malm & D'Agostine*, 423 Mass. 558, 559 (1996) (firm "represent[ed] differing interests" by advising both buyer and seller, when fifty per cent shareholder sold his interest in corporations to other fifty per cent shareholder).

Similarly unavailing is Stephen's argument that the "circumstances in which Baggia and Boyer consulted [him] did not give rise to the practice of law." By Stephen's logic, because Baggia and Boyer had already "worked out their own deal" when they came to him, he was acting "as their scrivener and not as their

---

[8]The rule did not require that such consent be in writing, as it does now. See Mass. R. Prof. C. 1.8 (a) (3), 426 Mass. 1338 (1998).

attorney." In support of this proposition, Stephen relies on *Lowell Bar Ass'n* v. *Loeb*, 315 Mass. 176 (1943) (*Loeb*), and *Matter of Chimko*, 444 Mass. 743 (2005). *Loeb*, *supra* at 185, considered whether "the business of making out income tax returns of the least difficult kind" by completing "blank forms furnished by the tax officials" constituted the practice of law. Acknowledging that nonlawyers frequently take actions, write documents, or give advice involving rules of law, the court stated that "[t]he proposition cannot be maintained, that whenever, for compensation, one person gives to another advice that involves some element of law, or performs for another some service that requires some knowledge of law, or drafts for another some document that has legal effect, he is practising law." *Id.* at 181. Our conclusion that filling out a client's tax forms did not constitute the practice of law was based on the fact that it involved a fairly mechanical use of "blank forms" with "plain printed instructions." *Id.* at 185. Similarly, in *Matter of Chimko*, *supra* at 749-750, an attorney's completion of a blank, standardized local court form did not constitute the practice of law.[9]

The substance of these cases is far removed from the situation here. Stephen and Richard designed the structure of the deal and drafted contracts for the transaction, substantially affecting the legal rights of Boyer, Baggia, and Mass. Bank. The fact that Boyer and Baggia had the original idea to transfer the property is irrelevant. In almost every transaction, it is the client who comes to the lawyer with a potential deal. Stephen recognized the legal impediments to a simple transfer of the property. Richard designed a legal solution to the problem, and Stephen drafted the documents effecting that solution. This is the quintessential provision of legal advice and services. We have said that the "actual practices of the community have an important bearing on the scope of the practice of law." *Loeb*, *supra* at 186. By that standard — indeed, by any standard — Stephen and Richard's actions constituted the practice of law.

4. *Sanction.* We review a recommended sanction by asking

---

[9]In *Matter of Chimko*, 444 Mass. 743, 749 (2005), the form at issue was substantially similar to Local Bankruptcy Form 6 for the United States Bankruptcy Court for the District of Massachusetts.

whether it is "markedly disparate from judgments in comparable cases." *Matter of Finn*, 433 Mass. 418, 423 (2001), and cases cited. "While this standard is relatively simple to state, it is one which is not always easy to apply because of factual nuances that distinguish cases from each other." *Matter of Shaw*, 427 Mass. 764, 768 (1998). We strive to decide each case "on its own merits" so that "every offending attorney [receives] the disposition most appropriate in the circumstances." *Matter of the Discipline of an Attorney*, 392 Mass. 827, 837 (1984).

Bar counsel asks us to impose on Stephen and Richard suspensions of three months. Such suspensions may be appropriate in cases of dual representation without consent causing harm. For example, in *Matter of Pike*, 408 Mass. 740, 740 (1990), we imposed a six-month suspension on a lawyer who acted as both broker for a lessor and counsel to a tenant in a real estate transaction, "for his financial aggrandizement and in disregard of the interests of his client." The attorney's behavior in that case was, however, more egregious than either of the respondents' here. Pike actively concealed his conflict and his financial interest in the transaction. *Id.* at 743. Although the respondents did not fulfil their affirmative obligation to disclose and seek consent, the history of their representation of Baggia was not a secret to Boyer.

Six-month suspensions have also been imposed for conflicts causing harm in *Matter of Thurston*, 13 Mass. Att'y Discipline Rep. 776 (1997), and *Matter of Taglino*, 9 Mass. Att'y Discipline Rep. 318 (1993). *Matter of Thurston, supra* at 782, involved an attorney who abetted a corporate officer's blatant violation of his fiduciary duty and who knowingly kept the other corporate officer unaware. In *Matter of Taglino, supra* at 319-320, a lawyer represented a buyer in a real estate sale after the seller referred the buyer to him. The lawyer did not disclose to the buyer that the seller was an ongoing client of his. He also induced the seller to execute several mortgages disadvantageous to the buyer's interests, resulting in financial harm. Like *Matter of Pike, supra*, these cases involved active and intentional deception, which is not at issue here.

The respondents' violations were errors of omission rather than commission. They failed to fulfil an affirmative obligation

to disclose, and were neglectful in delaying telling Boyer to seek counsel who would have his interests exclusively in mind. While it is of some concern that both respondents continue to deny the impropriety of this behavior, there is no suggestion or evidence here that they actively sought to deceive Boyer to Baggia's advantage, or to their own. This suggests a lesser sanction than those in the suspensions discussed above.

As the purpose of bar discipline proceedings is to maintain public confidence in the competence and propriety of attorneys, our conclusion as to the disposition most appropriate in the circumstances rests largely on "the effect upon, and perception of, the public and the bar." *Matter of Kerlinsky*, 428 Mass. 656, 664, cert. denied, 526 U.S. 1160 (1999), quoting *Matter of Finnerty*, 418 Mass. 821, 829 (1994). Therefore, "[w]e must consider what measure of discipline is necessary to protect the public and deter other attorneys from the same behavior." *Matter of Concemi*, 422 Mass. 326, 329 (1996). We believe that that interest is best served in this case by adopting the hearing committee's recommendation of a public reprimand for each of the respondents. Their actions, though wrongful, do not rise to the level warranting the more serious punishment of suspension.[10]

Under S.J.C. Rule 4:01, § 4, as appearing in 425 Mass. 1304 (1997), orders of disbarment and suspension are entered by this court, while reprimands are issued by the board. As we have determined that public reprimands are the appropriate sanction, we refer these cases to the board with instructions that it publicly reprimand both respondents for their actions in this matter.

*So ordered.*

---

[10]We do not consider the delay in this case as a factor mitigating the sanction because the respondents have not shown "substantial prejudice from the delayed investigation. Delay alone is insufficient to mitigate the sanction." *Matter of Grossman*, ante 151, 159 (2007), citing *Matter of Gross*, 435 Mass. 445, 451-452 (2001).