# United States Court of Appeals
## For the First Circuit

No. 15-1351

MOUNT VERNON FIRE INSURANCE COMPANY,

Plaintiff, Appellee,

v.

VISIONAID, INC. f/k/a H.L. Boulton Co. Inc.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Thompson, Circuit Judge,
Souter, Associate Justice,[*]
and Barron, Circuit Judge.

Kenneth R. Berman, with whom Heather B. Repicky and Nutter, McClennen & Fish LLP were on brief, for appellant.
David Burgess, Wilchins Cosentino & Novins LLP, Edward J. Stein, Marshall Gilinsky, and Anderson Kill P.C. on brief for United Policy Holders, amicus curiae.
James J. Duane III, with whom Scarlett M. Rajbanshi and Peabody & Arnold LLP were on brief, for appellee.
Michael F. Aylward and Morrison Mahoney LLP on brief for American International Group, Inc. and Massachusetts Insurance Federation Inc., amici curiae.

_____

[*] The Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

November 15, 2017

**THOMPSON, <u>Circuit Judge</u>**.

### Prologue

This is a diversity-based declaratory-judgment action governed (all agree) by Massachusetts substantive law. <u>See</u> <u>Erie R.R. Co.</u> v. <u>Tompkins</u>, 304 U.S. 64, 78 (1938). The case pits an insured, VisionAid, against its employment-practices liability insurer (say that ten times fast!), Mount Vernon (each party's official name appears in the caption). VisionAid and Mount Vernon are back after the busy Massachusetts Supreme Judicial Court ("SJC," for short) answered some state-law questions — arising from this litigation — that we had certified to it (we thank the SJC for its help). As things now stand, the only question left for us to decide is: Does a conflict of interest exist between the parties that permits VisionAid to choose the attorney to defend a suit brought against it by an ex-employee, with the tab for that defense picked up by Mount Vernon? Like the federal district judge below, we believe the answer is no.

### How We Got to This Point

Our opinion certifying the questions is found at 825 F.3d 67 (1st Cir. 2016). And the SJC's opinion responding to the questions is found at 76 N.E.3d 204 (Mass. 2017). Rather than fill up the pages repeating everything said before, we assume the reader's familiarity with these decisions and mention here only those details necessary to put today's matter into perspective.

VisionAid is a defendant in a suit filed by Gary Sullivan in Massachusetts state court. Sullivan essentially alleges there that VisionAid fired him as its vice president because he was too old. An attorney named Todd Bennett filed VisionAid's answer, insisting that VisionAid had canned Sullivan not because of his age, but because he had performed his job poorly, had acted insubordinately, and had embezzled money from VisionAid on a grand scale. Bennett got involved thanks to Mount Vernon, which — invoking the liability policy's terms — picked him to defend VisionAid. Mount Vernon originally acted under a "reservation of rights" (for anyone untutored in matters of insurance law, a proper reservation preserves an insurer's right to challenge any duty to defend at a later stage). But after VisionAid objected, Mount Vernon explicitly withdrew its reservation of rights and assumed the defense unconditionally.

In the midst of all this, Sullivan offered to drop his age-discrimination claim if VisionAid agreed not to pursue its embezzlement claim. VisionAid said no. VisionAid also made it clear around this time that it wanted Bennett to do more than just raise Sullivan's embezzlement as a defense — it wanted Bennett to raise the embezzlement allegation as a counterclaim. Mount Vernon refused, explaining that because the policy between them was a defense-liability policy, it had no duty to fund affirmative actions and so would not fund VisionAid's counterclaim.

- 4 -

Ultimately, VisionAid's personal counsel drafted the embezzlement counterclaim against Sullivan.

Pulling no punches, Mount Vernon filed the underlying federal-diversity action seeking a declaratory judgment vindicating its understanding of the policy. Not willing to back down, VisionAid responded with a two-count counterclaim: the first count seeking a declaration that Mount Vernon's duty to defend includes a duty to prosecute the embezzlement counterclaim, and the second count seeking a declaration that a conflict of interest between Mount Vernon and VisionAid entitles VisionAid to select the attorney to defend it in Sullivan's suit — we will say more later about the conflict issue; for now it is enough to note that VisionAid thinks Mount Vernon has an interest in "diminishing" the value of VisionAid's counterclaim, because the counterclaim is "impeding" settlement.

Eventually the parties cross-moved for summary judgment. Acting on the motions, the federal district judge ruled that given the policy's plain language, Mount Vernon's duty to defend does not oblige it to foot the bill for VisionAid's affirmative counterclaim — a result, he added, that did not violate any state law. And then the judge rejected what he called VisionAid's "counter-intuitive assertion" that Mount Vernon and Bennett "have an interest in devaluing the counterclaim." "The strength of VisionAid's counterclaim," the judge wrote,

both weakens the wrongful termination case against VisionAid and increases appointed counsel's bargaining power in settlement negotiations. Devaluing the counterclaim would undermine Mount Vernon's own interest in limiting Sullivan's recovery for wrongful termination.

Finally, the judge refused "to acknowledge VisionAid's parade of horribles" it believes will occur if appointed counsel defends against Sullivan's claims and VisionAid's personal counsel prosecutes the counterclaim. "[T]here is," the judge noted, "nothing inherently impractical or unwieldy about VisionAid relying on its own separate counsel to assert the counterclaim." For support, the judge noted that in responding to Sullivan's complaint, appointed counsel wrote the answer and VisionAid's own counsel wrote the counterclaim. Which, the judge stressed, goes to show that these "separate attorneys" can "collaborate and yet accomplish their distinct objectives."

A disappointed VisionAid appealed to us. And for the reasons recorded in our prior opinion, we certified three questions to the SJC — two on the duty-to-defend issue and one on the conflict-of-interest issue:

> (1) Whether, and under what circumstances, an insurer (through its appointed . . . counsel) may owe a duty to its insured . . . to prosecute the insured's counterclaim(s) for damages, where the insurance contract provides that the insurer has a "duty to defend any Claim," i.e., "any proceeding initiated against [the insured]"?
>
> (2) Whether, and under what circumstances, an insurer (through its appointed . . . counsel) may owe a duty to

its insured to fund the prosecution of the insured's counterclaim(s) for damages, where the insurance contract requires the insurer to cover "Defense Costs," or the "reasonable and necessary legal fees and expenses incurred by [the insurer], or by any attorney designated by [the insurer] to defend [the insured], resulting from the investigation, adjustment, defense, and appeal of a Claim"?

(3) Assuming the existence of a duty to prosecute the insured's counterclaim(s), in the event it is determined that an insurer has an interest in devaluing or otherwise impairing such counterclaim(s), does a conflict of interest arise that entitles the insured to control and/or appoint independent counsel to control the entire proceeding, including both the defense of any covered claims and the prosecution of the subject counterclaim(s)?

825 F.3d at 72 (brackets in original; ellipses added). That court recently returned its answers, albeit by a divided vote. On question (1), the SJC ruled that "an insurer with a contractual duty to defend an insured is not required to prosecute an affirmative counterclaim on the insured's behalf," either under the "contractual language in the policy at issue or the common-law" of Massachusetts. 76 N.E.2d at 208. On question (2), the SJC held that "the duty to pay defense costs has the same scope as the duty to defend, and thus does not require an insurer to pay the costs of prosecuting a counterclaim on behalf of the insured[.]" Id. And on question (3), the SJC concluded that given its other two answers, it need not reach the conflict-of-interest issue as framed by us. Id.

- 7 -

After the SJC's opinion came down, VisionAid asked us to let each side file supplemental briefs "to address how the [SJC's] decision affects the resolution of the remaining" conflict-of-interest question.  In its telling, regardless of who pays the fees to prosecute the embezzlement counterclaim (VisionAid or Mount Vernon), an obvious conflict of interest exists "that affects the right to select counsel" to "defend VisionAid against Gary Sullivan's complaint."  Mount Vernon opposed the request for more briefing.  Accepting VisionAid's view that the SJC's decision does not necessarily dispose of the conflict issue, we allowed additional briefing from both sides and invited any interested amicus to chime in too.  With these materials in hand, we tackle the conflict question (which again is the only question before us), without requiring another round of oral argument.[1]

### The Parties' Take

The parties argue over the conflict-of-interest matter keenly and vigorously — which is not a surprise, given how hard

---

[1]  We thank the amici for their participation in this matter (their names appear up near our caption).  But we cue the reader — with the citation at the end of this sentence — that precedent tells us to ignore arguments advanced only "by amici and not by parties."  In re Sony BMG Music Entm't, 564 F.3d 1, 3 (1st Cir. 2009).

they have fought in multiple courts.  Bear with us now as we plow through their contentions.

VisionAid throws a lot of arguments at us, all based on its understanding of Massachusetts law.  For starters, VisionAid argues that Bennett — the insurer-appointed counsel — represents both VisionAid and Mount Vernon.  This being so, the argument continues, Bennett must act in good faith, diligently carrying out his duties without sacrificing VisionAid's interests to Mount Vernon's interests.  But to VisionAid's way of thinking, Bennett has not lived up to — and will not live up to — his obligations.

Elaborating on why it feels this way, VisionAid insists Bennett has a conflict of interest caused by "the settlement dynamics underlying" Sullivan's case — a conflict that prevents VisionAid from being able to "trust any attorney appointed by Mount Vernon to protect VisionAid's interests."  In VisionAid's mind, Mount Vernon's "settlement leverage comes not from proving every dollar [Sullivan] embezzled but from developing the embezzlement evidence only to the point that . . . [he] is incentivized" to settle by executing a mutual release, with no money changing hands. Actually, as VisionAid points out, Sullivan now says he will dismiss his age-discrimination claim if VisionAid dismisses its embezzlement counterclaim, with not a penny going to any party. But, the argument proceeds, if Bennett's development of the

- 9 -

embezzlement evidence "gives VisionAid a pathway to recover most or all" of what Sullivan took, then VisionAid would be crazy to settle on those terms, because such a settlement would let Sullivan keep the stolen cash. And letting Sullivan shuffle off with the loot would, in VisionAid's telling, mean that VisionAid "would . . . be funding the settlement of a claim that Mount Vernon contractually insured and would be relieving Mount Vernon of its indemnity obligation" — a result Mount Vernon would love (because the case would end at the lowest cost to Mount Vernon) but VisionAid would hate (because, again, VisionAid would be kissing the embezzled money goodbye).

Explaining further, VisionAid argues that to help make Mount Vernon's best-case self-interest scenario a reality, Mount Vernon will pull out all the stops — including having Bennett "devalue" the counterclaim, something Bennett will do to curry favor with Mount Vernon (so he can keep getting cases from Mount Vernon). "[A] devalued counterclaim," the theory goes, "would reduce what VisionAid could justifiably expect to recover, thus giving [it] fewer reasons to litigate and more incentive to settle." And to hear VisionAid tell it, any Mount Vernon-selected defense lawyer could pursue this devaluation strategy to the hilt, given the enormous "influence" he will have "over how the embezzlement aspect of the case is shaped," even as VisionAid's

- 10 -

own lawyer pursues the counterclaim. "That influence," VisionAid writes,

> comes from questions the [Mount Vernon-selected] defense attorney chooses to ask, information the defense attorney volunteers to [Sullivan's] counsel, gratuitous statements the defense attorney makes in court filings or open court, defense counsel's strategy decisions, defense counsel's request for jury instructions and special questions, and the like.

And even if Mount Vernon does not "subjectively" want to "devalue the counterclaim," VisionAid believes Mount Vernon is still conflicted "because, objectively," it is in Mount Vernon's best interest to cheapen the counterclaim. Further, any "common interest" Mount Vernon and VisionAid may have "in defeating Sullivan's claim" is not enough to "cure" this conflict.

Moving on, VisionAid also notes that the policy has a clause saying Mount Vernon cannot settle any claim without VisionAid's "consent."[2] But VisionAid contends this clause hardly ensures against a conflict of interest, because — to quote its appellate papers — if VisionAid does "veto a settlement," Mount Vernon can "take away policy benefits, adding pressure on VisionAid not to veto a settlement."[3] So instead of "curing the conflict,

---

[2] The policy states (emphasis ours) that "[Mount Vernon], as it deems expedient, has the right to investigate, adjust, defend, appeal and, *with the consent of* [VisionAid], negotiate a settlement of any Claim."

[3] The part of the policy VisionAid points to says that if VisionAid "refuses to consent to a settlement recommended by [Mount Vernon]," then Mount Vernon's obligation is

the consent-to-settle clause exacerbates it" — at least that is what VisionAid says.

Expanding on its worst conjured-up nightmare, VisionAid talks about how this "dual representation" — with a Mount Vernon-chosen lawyer working to defeat Sullivan's complaint, and a VisionAid-chosen lawyer working to prevail on the counterclaim — will create a number of problems. For one thing, dual representation will result in a sort of "schizophrenic representation": instead of a "single lawyer" working to "implement[] a cohesive case strategy" as VisionAid's "advocate," VisionAid will have two attorneys possibly providing separate (a) opening and closing statements, (b) objections to questions and answers, and (c) requests for jury instructions, to name just a few of the "logistical problems" VisionAid fears. For another thing, dual representation could lead "the jury to infer the existence of insurance coverage, a fact courts scrupulously seek

---

limited to:

(1) the amount of the covered Loss in excess of the Retention which [Mount Vernon] would have paid in settlement at the time the Insured first refused to settle;

(2) plus covered Defense Costs incurred up to the date [VisionAid] first refused to settle;

(3) plus seventy five percent (75%) of covered Loss and Defense Costs in excess of the first settlement amount recommended by [Mount Vernon] to which [VisionAid] did not consent.

to keep away from juries."  And finally, because Sullivan's embezzlement "is just as much a ground for denying relief under the complaint as it is for awarding relief under the counterclaim," dual representation "raises the prospect that Mount Vernon could provide less than a robust defense (and less than the full defense required by the insurance contract) by relying on VisionAid's counsel to pull the laboring oar."  Or so VisionAid frets.

As a final point, VisionAid argues that any insurer-appointed counsel in Bennett's shoes would be conflicted out under Rule 1.7 of the Massachusetts Rules of Professional Conduct.[4]  And

---

[4] The current version of Rule 1.7 declares:

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest.  A concurrent conflict of interest exists if:

> (1) the representation of one client will be directly adverse to another client; or

> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

> (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

> (2) the representation is not prohibited by law;

> (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same

- 13 -

VisionAid thinks the only way out of this mess is to let it choose "its own counsel to handle its entire representation," *i.e.*, to let it pick the one lawyer who will defend against Sullivan's claim (on Mount Vernon's dime) and press the counterclaim (on VisionAid's dime).  VisionAid concedes that "[n]ot all counterclaims create a conflict of interest."  Quoting comment 17 to Rule 1.7, VisionAid argues that "[w]hether clients are aligned directly against each other . . . requires an examination of the context of the proceeding" — as a for-instance, VisionAid says "there might be no conflict . . . if the tort claimant will settle the complaint without requiring that the counterclaim be dismissed or released." VisionAid believes context shows a conflict here.  So ultimately, VisionAid asks us to vacate the judgment below and remand for entry of a new judgment — a judgment that would declare that VisionAid has the right to select its own lawyer to defend it in Sullivan's suit at Mount Vernon's expense, with the obvious exception (because of the SJC's ruling) that VisionAid will have to pay for the counterclaim's prosecution.

---

litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

Mount Vernon's views on the conflict-of-interest issue are different from VisionAid's, to say the least.  Mount Vernon, for example, says appointed counsel has one (and only one) client in this case — VisionAid.  And, the argument goes, consistent with his contractual and ethical obligations, Bennett will not do anything to water down the counterclaim.  Insisting it wants a strong counterclaim, not a weak one, Mount Vernon writes that a powerful counterclaim "could help" defeat "Sullivan's claim, a claim that both Mount Vernon and VisionAid clearly have an interest in defeating."

What VisionAid wants us to do, writes Mount Vernon, is to conclude that appointed-counsel Bennett "will neglect his obligations and duties to VisionAid and try to impair or harm the counterclaim" — even though, according to Mount Vernon, there is no basis (either legal or factual) to support such "a serious allegation."  But even if Bennett wanted to "devalue" the counterclaim, he could not do so, because — to quote its supplemental brief — "VisionAid's personal counsel is the attorney who will be responsible for handling the counterclaim."  So during the Sullivan suit, Bennett and VisionAid's personal lawyer will present "a unified front on behalf of their common client, VisionAid."  On top of that, Mount Vernon believes VisionAid's devaluation theory is completely off base, because "Sullivan has

already proposed an exchange of releases, reducing the value of his claim to zero, and the counterclaim was not 'devalued'" in the slightest.

Mount Vernon is equally adamant that the counterclaim is not an "impediment" to settling Sullivan's claim, noting that the counterclaim helped nudge "settlement negotiations in VisionAid's and Mount Vernon's favor because the counterclaim convinced [him] to reduce his settlement demand to zero on the condition that VisionAid dismiss the counterclaim against him." More, Mount Vernon believes VisionAid holds all the trump cards: given the consent-to-settle clause, Mount Vernon cannot resolve "any [c]laim" without VisionAid's OK; and even without that clause, because VisionAid's own lawyer will be prosecuting the counterclaim, any settlement would require VisionAid's blessing. Still more, while Mount Vernon surely wants to "keep[] [defense] costs and expenses low," it thinks that interest is completely "outweighed" both by "its obligation to defend [VisionAid] vigorously" and by the "[p]olicy's consent to settle clause" — a clause Mount Vernon states it must "honor, and has honored, throughout this litigation." And, Mount Vernon says, if VisionAid wants to take Sullivan to trial, then Mount Vernon "will have to pay to defend the case" to the end.

Beyond that, Mount Vernon sees no conflict under Rule 1.7(a). And, to boot, Mount Vernon says VisionAid waived any supposed conflict under Rule 1.7(b).[5]

The bottom line is Mount Vernon wants us to affirm the district judge by holding "that the mere existence" of the embezzlement "counterclaim, which Mount Vernon has no duty to prosecute, does not give rise to a conflict of interest between Mount Vernon and VisionAid that entitles VisionAid to independent counsel at Mount Vernon's expense" — to hold otherwise would mean that in all cases "in which an insured file[s] a counterclaim," a conflict would result "that would entitle the insured to have its personal counsel defend against the plaintiff's claim."

---

[5] To save the reader the need to peek back to footnote 4, we re-quote Rule 1.7(b) here:

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

## Our Take

Because the SJC saw no need to answer the certified question on the conflict-of-interest matter — which is understandable, given how we had framed question (3) — we must do a bit of mind reading and predict how that court would handle the issue. See, e.g., Candelario Del Moral v. UBS Fin. Servs. Inc., 699 F.3d 93, 98 (1st Cir. 2012) (calling such an exercise "an Erie prediction"). And after reviewing the matter de novo — which is a fancy way of saying we take a fresh look at the issue, see id. at 99 — we think the federal district judge decided the case the way the SJC would have decided it. We explain our reasoning below, rejecting most of VisionAid's arguments in the text of our opinion and others in the opinion's footnotes.

Putting first things first, we begin with the parties' quarrel over who Bennett is counsel for — VisionAid *and* Mount Vernon (as VisionAid argues), or just VisionAid (as Mount Vernon contends). An insurer-appointed lawyer "is attorney for the insured as well as the insurer" — those are not our words, but the SJC's. See McCourt Co. v. FPC Props., Inc., 434 N.E.2d 1234, 1235 (Mass. 1982). And according to another SJC case, this dual-representation phenomenon means that an insurer-appointed lawyer "owes to each a duty of good faith and due diligence in the discharge of his duties," which in turn means that he cannot "subordinate[]" "[t]he rights of one . . . to those of the other."

- 18 -

Imperiali v. Pica, 156 N.E.2d 44, 47 (Mass. 1959), abrogated in part on other grounds by Darcy v. Hartford Ins. Co., 554 N.E.2d 28, 32-33 (Mass. 1990).  Mount Vernon tries to sidestep these statements, essentially calling them dicta, while VisionAid treats them as holdings — dicta, by the way, are parts of an opinion that are not integral to the decision's analysis and so do not generally bind later courts.  See, e.g., United States v. Martinez, 762 F.3d 127, 134-35 (1st Cir. 2014).

Unfortunately for Mount Vernon, a case of ours — Vicor Corp. v. Vigilant Ins. Co. — read "Massachusetts law" as recognizing that "an attorney retained by an insurer to represent the insured" is "the attorney for *both*."  See 674 F.3d 1, 19 (1st Cir. 2012) (emphasis added) (citing and relying on Imperiali). Vicor Corp.'s conclusion is not only consistent with the Imperiali line of cases, it is also jibes with an ethics opinion by the Massachusetts Bar Association declaring that "an attorney . . . retained by" an insurer "to represent an insured" represents both the insurer and the insured "in defeating the plaintiff's litigation . . . ."  See Mass. Bar Ass'n Comm. on Prof'l Ethics, Op. 77-16 (1977).[6]

---

[6] The Bay State's law books are full of SJC decisions relying on ethics opinions from the Massachusetts Bar Association.  See, e.g., Clark v. Beverly Health & Rehab. Servs., Inc., 797 N.E.2d 905, 912 n.11 (Mass. 2003); Commonwealth v. Goldman, 480 N.E.2d 1023, 1028 n.7 (Mass. 1985).

Mount Vernon cites no contrary authority. Nor does it offer any persuasive reason to doubt the applicability of the cases just discussed. So, consistent with Vicor Corp., we agree with VisionAid that Bennett represents both VisionAid and Mount Vernon. See generally United States v. Wogan, 938 F.2d 1446, 1449 (1st Cir. 1991) (explaining "that in a multi-panel circuit, prior panel decisions are binding upon newly constituted panels in the absence of supervening authority sufficient to warrant disregard of established precedent").

But winning the who-does-Bennett-represent battle does not help VisionAid win the war.

VisionAid's appeal stands or falls on whether (as VisionAid puts it) Mount Vernon's objective "interest in devaluing" the embezzlement counterclaim causes a conflict that gives VisionAid the right to choose the lawyer to defend Sullivan's suit (with Mount Vernon paying for everything but costs associated with prosecuting the counterclaim). We think the appeal falls flat.

By our lights, both Mount Vernon and VisionAid want to crush Sullivan's suit. A muscular counterclaim will go a long way in making that happen. But a weak one certainly will not. No one doubts that the counterclaim's strength convinced Sullivan to drop his settlement demand to zero dollars, with the proviso that VisionAid dismiss its claim against him. Surely if Mount Vernon

or Bennett did something to cripple the counterclaim, Sullivan could demand more to settle his claim. And it goes without saying (but we say it anyway) that giving Sullivan any kind of leverage is not in either Mount Vernon's or VisionAid's best interests, since (at the risk of sounding like an iPod stuck on replay) they share the same goal — *parrying Sullivan's suit*. Also and critically, we see nothing in the summary-judgment record suggesting Mount Vernon wants to torpedo the counterclaim. See, e.g., RTR Techs., Inc. v. Helming, 707 F.3d 84, 93 (1st Cir. 2013) (emphasizing that to stop "the entry of summary judgment, the law requires more than arguments woven from the gossamer strands of speculation and surmise").

But even if we assume — counterintuitively — that Mount Vernon wants to diminish the counterclaim, it is hard to see how it could pull that off. Remember, per the SJC's response to our certified questions, neither Mount Vernon nor Bennett will play any role in prosecuting the counterclaim — VisionAid will have its own lawyer handling that job. See 76 N.E.3d at 213. And in fulfilling his or her ethical duty to provide zealous representation, VisionAid's personal attorney can make sure that no one devalues the counterclaim in any way, shape, or form. Also protecting VisionAid is the undisputed fact that, per the insurance policy's terms, neither Mount Vernon nor Bennett can settle Sullivan's suit — regardless of how low the settlement figure is

(even if it is zero!) — without VisionAid's consent.[7] And VisionAid cites no summary-judgment evidence suggesting anyone connected with Mount Vernon has ignored VisionAid's wishes to let the underlying litigation play out so that VisionAid can pursue its counterclaim — that spells trouble for VisionAid, because as all summary-judgment movants should know, arguments "that depend not on verified facts but 'on arrant speculation, optimistic surmise, or farfetched inference' cannot forestall summary judgment." See Fragoso v. Lopez, 991 F.2d 878, 887 (1st Cir. 1993) (quoting Kelly v. United States, 924 F.2d 355, 357 (1st Cir. 1991)).

As for VisionAid's battalion of counterarguments, though ably presented, we believe none persuades.

Take VisionAid's claim that "even an 'overwhelming common interest'" between it and Mount Vernon does not cure the conflict. The case VisionAid cites for support involves an attorney who represented both the debtor *and* the creditor on a loan and a sale to satisfy a debt. See In re Wainwright, 861 N.E.2d 440, 446 (Mass. 2007). "[A] creditor's legally enforceable rights against his debtor presents a classic conflict of legal interests" such that "[e]ven if the parties had an 'overwhelming

---

[7] Because an exchange of releases requires VisionAid's signature and because VisionAid's own lawyer will be in the case prosecuting the counterclaim, neither Mount Vernon nor Bennett can push a settlement through without VisionAid's acceptance and assistance.

common interest,' each considering the transaction mutually advantageous, the debtor-creditor relationship necessarily created 'conflicting interests.'" Id. And while there may be some tension between VisionAid and Mount Vernon, we see no disqualifying conflict — let alone the kind of classic conflict at play in Wainwright. So Wainwright holds no sway here.

Also holding no sway is VisionAid's contention — made in its supplemental reply brief — that the consent-to-settle clause fails to protect against a conflict of interest. As noted above, VisionAid's big complaint is that if it "veto[es]" a settlement offer, then under the policy it could lose "insurance benefits" — meaning the clause has the effect of incenting VisionAid to cave in and settle.[8] But VisionAid's theory about how the consent-to-settle clause "punishes" it for killing "a settlement" is triply waived: first because VisionAid did not develop the theory in its summary-judgment memos, see McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 22 (1st Cir. 1991);[9] second because VisionAid did not

---

[8] The provision VisionAid points to appears to be a standard clause. Cf. generally Quantum Park Prop. Owners' Assoc., Inc. v. U.S. Liab. Ins. Co., No. 14-80845-Civ-Dimitrouleas, 2015 WL 11422283, at *2 (S.D. Fla. Mar. 26, 2015) (quoting a substantially similar provision).

[9] VisionAid's one-sentence footnote statement in a summary-judgment memo that "[t]he policy lays out certain consequences to VisionAid if it withholds consent and a judgment is rendered against [it]" does not suffice, given how VisionAid provided no discussion of the policy's provisions or citation to relevant authority. See McCoy, 950 F.2d at 22 (declining to address an issue when a district-court party mentioned it only in passing "—

- 23 -

develop the theory in its opening appellate brief, see <u>Cornwell</u> <u>Entm't, Inc.</u> v. <u>Anchin, Block & Anchin, LLP</u>, 830 F.3d 18, 32 (1st Cir. 2016); and third because VisionAid cites no authority for the theory in its supplemental reply brief (nor does VisionAid give a convincing explanation of what the law should be, assuming it found no caselaw), see <u>Medina-Rivera</u> v. <u>MVM, Inc.</u>, 713 F.3d 132, 140-41 (1st Cir. 2013); <u>Town of Norwood</u> v. <u>Fed. Energy Regulatory Comm'n</u>, 202 F.3d 392, 405 (1st Cir. 2000).[10]

And despite what VisionAid thinks, there is nothing unworkable or "schizophrenic" about having two attorneys representing it in the Sullivan litigation. VisionAid's imaginings about the fights between lawyers over trial strategy overlooks a critical fact: *VisionAid* is the final decision-maker on that score. One need not take our word on this. Listen to what the person Mount Vernon designated to testify on its behalf had to say: asked "[w]ho would resolve disagreements" between the

---

a mention which, in its entirety, comprised two sentences and one citation (to a tangentially relevant case)"); see also <u>United States</u> v. <u>Bongiorno</u>, 106 F.3d 1027, 1034 (1st Cir. 1997) (admonishing that "matters not squarely presented below generally cannot be advanced on appeal"). This raise-or-waive rule is "founded upon important considerations of fairness, judicial economy, and practical wisdom," <u>Nat'l Ass'n of Soc. Workers</u> v. <u>Harwood</u>, 69 F.3d 622, 627 (1st Cir. 1995), and there is no sound reason not to apply the rule here.

[10] FYI: nothing in our order granting VisionAid's request for supplemental briefing suggests we would ignore longstanding raise-or-waive principles.

attorneys "if they could not," he declared that "[u]ltimately they have to go with whatever VisionAid want[s] to do."  The dissenters in the SJC opinion answering our certified questions argued — similar to the way VisionAid argues here — that "[i]n almost all situations it is totally impracticable to have two lawyers" representing the insured.  See 76 N.E.3d at 214-15 (Gants, C.J., with whom Lenk, J., joined, dissenting) (alteration in original) (quoting Richard L. Neumeier, Serving Two Masters:  Problems Facing Insurance Defense Counsel and Some Proposed Solutions, 77 Mass. L. Rev. 66, 80 (1992)).  But tellingly, the majority was unmoved — which also catapults this argument into thin air.  If more were needed — and we do not think that it is — a just-released decision by a Massachusetts intermediate appellate court suggests that the fact that the insurer and the insured hold differing views about defense "tactics . . . do[es] not give rise to a sufficient conflict of interest under [Bay State] law to justify [the insured's] refusal of [the insurer's] control of the defense."  See OneBeacon Am. Ins. Co. v. Celanese Corp., No. 16-P-203, 2017 WL 4583266, at *5 (Mass. App. Ct. Oct. 16, 2017).  And lest anyone wonder whether we can look to OneBeacon in making our Erie predication — we can, because we do not think the SJC would reject the lower court's reasoning.  See Candelario Del Moral, 699 F.3d

at 102 n.7; see also Andrew Robinson Int'l, Inc. v. Hartford Fire Ins. Co., 547 F.3d 48, 51 (1st Cir. 2008).[11]

A major part of VisionAid's conflict theory turns on the idea that Bennett — in defiance of his ethical obligations to VisionAid — will do anything he can to help client Mount Vernon and to hurt client VisionAid. And VisionAid believes Fiandaca v. Cunningham, 827 F.2d 825 (1st Cir. 1987), makes its charge plausible. We reject this theory.

As for evidence that Bennett will act unethically — evidence is important, because we (like the district judge) cannot credit "conclusory allegations, improbable inferences, and unsupported speculation," Medina–Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) — VisionAid fleetingly suggests in its reply brief here that a note by a Mount Vernon employee "show[s]" the Mount Vernon-appointed counsel "told Mount Vernon" (before the SJC opinion came down) that "he might be forced to file VisionAid's counterclaim but would not recognize its validity

---

[11] As for VisionAid's worry that the jury might infer the existence of insurance based on the dual-representation scenario, it appears "in a single sentence" in its appellate submissions, "is not seriously supported, and is therefore waived." Bandt v. Wand Partners, 242 F.3d 6, 22 (1st Cir. 2001). Ditto for VisionAid's suggestion — made without citation to legal authority — that an insurer-appointed counsel has an automatic conflict with an insured because counsel may get multiple case assignments from the insurer. See, e.g., Rezende v. Ocwen Loan Servicing, LLC, 869 F.3d 40, 43 (1st Cir. 2017) (concluding that a party "waived" an "argument by failing to cite any authority whatsoever in support of his conclusory assertion").

as a defense." Even putting aside any possible hearsay problems, we think this argument does VisionAid no good. There is a strong argument that the highlighted statement — reflecting Mount Vernon's position *before* the SJC opinion came down — has no oomph now that the SJC has held that Mount Vernon is not required to prosecute the counterclaim. Regardless, we consider the argument doubly waived — first for not being made below (and the situation does not fit within any of the rare exceptions to the raise-or-waive rules), and then for not being developed in its initial brief here. See respectively McCoy, 950 F.2d at 22; Small Justice LLC v. Xcentric Ventures LLC, 873 F.3d 313, 323 n.11 (1st Cir. 2017).

And as far as Fiandaca goes, we see night-and-day differences between that case and this one. The Fiandaca lawyer (simplifying slightly) represented a class of female state inmates housed by the state prison warden. See 827 F.2d at 826. The class plaintiffs wanted better facilities. Id. The parties eventually agreed to settle the suit by having the state set up a facility at the site of a state school. Id. at 827. But class counsel also represented residents of that school in a suit challenging the school's conditions. Id. at 829. These residents did not want the state to establish a facility there, it turns out. Id. And the settlement fell apart. Id. at 827-28. The state complained to us that the district court stumbled by not disqualifying class counsel for a conflict of interest. Id. at 826. We agreed, saying

that "the combination of clients and circumstances placed [class counsel] in the untenable position of being simultaneously obligated to represent vigorously the interests of two conflicting clients."  Id. at 829.  Getting back to our case, we believe Bennett is not in an "untenable position," because Mount Vernon is contractually barred from making him settle the case against VisionAid's wishes — which means Fiandaca is not a game-changer for VisionAid.

Switching to VisionAid's Rule 1.7 arguments, we need only say this:  Given our conclusion that Bennett has no disqualifying conflict, the crucial premise behind VisionAid's Rule 1.7 thesis — that Bennett's representation of Mount Vernon is (in Rule 1.7 lingo) "directly adverse" to his representation of VisionAid, or that his representation of VisionAid is "materially limited" by his responsibilities to Mount Vernon — is a no-go. That, unsurprisingly, dooms VisionAid's Rule 1.7 argument. Obviously then, VisionAid's intimation that Mount Vernon is "aligned directly against" it also goes nowhere, because the circumstances here cut against that theory.

**Epilogue**

Tasked with settling a dispute about Massachusetts law the way the SJC would settle it, our best assessment is:  Given the particulars of the current controversy, we believe the SJC would agree that the presence of the embezzlement counterclaim —

which Mount Vernon neither has to prosecute nor pay for — does not generate a conflict of interest entitling VisionAid to separate counsel to defend against Sullivan's suit at Mount Vernon's expense.  We say this knowing that because federal courts cannot make their state-law interpretations binding on state courts, Massachusetts "is free to tell us" in some future case that our analysis is "all wet" and so "wipe away what we have written." See Candelario Del Moral, 699 F.3d at 101; see also Smith v. F.W. Morse & Co., 76 F.3d 413, 429 n.12 (1st Cir. 1996) (explaining that "[w]hen the highest court of a state disposes of an issue of state law contrary to the resolution of the issue theretofore suggested by a federal court, the latter ruling must give way"); cf. generally Diginet, Inc. v. W. Union ATS, Inc., 958 F.2d 1388, 1395 (7th Cir. 1992) (Posner, C.J.) (stressing that "[s]tate courts are not bound by federal courts' interpretations of state law" and noting that "[a] state judge will give such interpretations no more weight than their persuasiveness earns them").

*Affirmed*.